UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
Pensacola Division

CONVENT PROPERTIES, LLC          *
                                 *
          Plaintiff,             *
                                 *     Case No. CV-2025-128
v.                               *
                                 *
KISSAWAY LLC                     *
                                 *
          Defendant.             *

## COMPLAINT

Plaintiff Convent Properties, LLC ("Plaintiff") files this Complaint against Defendant Kissaway LLC ("Kissaway") to assert the following claims and demand for relief.

## OVERVIEW

Plaintiff's claims arise from a 2021 lease agreement pursuant to which Plaintiff leased Kissaway a quail hunting plantation located in Jefferson County, Florida that Plaintiff owned and managed since approximately 2014. The plantation is a sprawling tract of land with a large lake, duck pond, pastures, and wooded trails and contains certain attachments, including a main house, separate staff residence, barn, sixteen (16)-stall horse stables, dog kennels, and horse pastures enclosed with wooden fencing.

1

Maintaining the nearly 1,200 acre-plantation required Plaintiff to invest considerable resources, both time and money, including employing a full-time property manager and additional staff to ensure the land and attachments thereto were properly managed and maintained. During the years Plaintiff occupied and operated the plantation prior to leasing it to Kissaway, the plantation was kept in pristine condition. Anything less was unacceptable since proper maintenance was necessary to protect Plaintiff's financial investment and ensure Plaintiff's full use of the plantation and related benefits of ownership. Among other ownership benefits, each year Plaintiff sold a certain number of hunting days to guests, some of whom were Plaintiff's business partners or colleagues. Due, in large part, to Plaintiff's contributions and investment in the plantation, the quail hunting and other amenities made the plantation a topnotch hunting destination, fetching rates as high as $20,000 per day.

Pursuant to the lease agreement executed by the parties in May 2021, for the contemplated three (3)-year term that Kissaway would occupy the plantation, Kissaway was solely responsible for performing necessary maintenance and repairs, and the lease agreement required Kissaway to operate and maintain the plantation "in a manner consistent with past practice and in a commercially-reasonable manner for properties like the Premises [i.e., similar quail hunting plantations]." Once the term of the lease terminated or expired, the lease

agreement required Kissaway to surrender the plantation in the same condition (ordinary wear and tear excluded) as it existed at the start of the lease.  As the evidence in this case easily will establish, Kissaway totally failed to honor any of the above obligations.

After the lease agreement terminated in 2024, Kissaway eventually vacated the plantation but left many areas in shambled disrepair.  There were broken or missing fences throughout the horse pastures and around the barn, making some areas of the pastures unsafe for horses.  In addition to leaving the interior stables filthy (littered with horse manure and trash), the barn was dilapidated, with doors falling off or hanging by the hinges, and it was covered in peeling paint and wood rot.  Contrary to the lease agreement, Kissaway also failed to follow standard land-management practices for preserving and sustaining the land and ecosystems, including in the big lake and duck pond. Similarly, Kissaway failed to perform even basic landscape maintenance. Trees and vegetation were growing over the windows and roof of the main house and invading the lake and duck pond, and pine straw beds were empty or had not been replenished in quite some time.  Additionally, no maintenance at all was done to the lake or duck pond.  The lake had not been shocked, fed, or restocked, and the duck pond had not been drained and cleaned.

In sum, rather than care for the plantation in the same manner as Plaintiff, as Kissaway was contractually obligated to do, Kissaway neglected the plantation. Though Plaintiff was shocked and saddened to see what three (3) years of Kissaway's utter neglect did to its plantation, prior to filing its Complaint, Plaintiff attempted to reach an amicable resolution with Kissaway in an effort to avoid litigation. In December 2024, Plaintiff notified Kissaway of the maintenance items at issue and projected cost for making necessary repairs to the barn, fences, duck pond, and landscaping. Kissaway, in response, essentially called Plaintiff a liar, claiming that all of the items at issue preexisted the lease and/or were not Kissaway's responsibility. According to Kissaway, Plaintiff's attempt at an amicable resolution was improperly "seeking to fund raise for [its] property renovations at [Kissaway's] expense." Kissaway's attempt to shirk its contractual obligations by blaming Plaintiff for Kissaway's unfulfilled contractual promises fails. Likewise, the credibility of Kissaway's assertions are belied by facts and evidence that Kissaway cannot reasonably dispute.

For starters, Kissaway never once mentioned to Plaintiff any items needing repair or maintenance, either prior to entering the lease agreement or at any time over the next three (3) years, and Kissaway cannot demonstrate otherwise. Moreover, Kissaway occupied and used the plantation throughout

the lease term with no complaint and all while continuing to pay hefty amounts in monthly rent. No reasonable factfinder would conclude or believe that Kissaway or the various guests that paid to reserve hunting days, including around the start of the 2021 lease, would pay such significant sums for the right to use a rundown and badly neglected plantation. The evidence in this case will establish the condition of the plantation at the start of the lease versus the condition of the plantation at the end of the lease, and Kissaway cannot escape liability for its broken contractual promises.

Therefore, and as alleged more fully below, Plaintiff respectfully asks the Court to: (i) declare the parties' rights and obligations with respect to a bona fide dispute concerning whether the lease agreement obligated Kissaway to maintain and repair the items at issue; and (ii) find that Kissaway breached material terms of the lease agreement, entering judgment in Plaintiff's favor and awarding Plaintiff damages, including compensatory damages, reimbursement of its reasonable attorney's fees and expenses, and additional relief as more specifically set forth herein.

## **PARTIES**

1. Plaintiff Convent Properties, LLC ("Plaintiff" or "Convent") is a limited liability company formed in Louisiana and registered to conduct business in the State of Florida. Plaintiff's only three members are Mr. Thomas C. Weller,

Jr. ("Mr. Weller"); the Kathryn Chelsea Weller Trust of 2012; and the Elizabeth Cameron Weller Trust of 2012 (collectively, the "Trusts").  Mr. Weller resides in and is a citizen of the State of Florida.  The Trusts are traditional trusts administered by Ms. Chelsea Weller and Ms. Cameron Weller.  They reside and administer the trusts in the States of Alabama (Ms. Chelsea Weller) and Georgia (Ms. Cameron Weller).  As such, and as discussed further below (*supra*, at ¶ 3), the Trusts are citizens of the States of Alabama and Georgia.

2.    Defendant Kissaway is a limited liability company formed in Virginia.   The only known member of Kissaway is Mr. Peter Goodwin.  Mr. Godwin resides in and is a citizen of the State of Virginia.  *See also, supra,* at ¶ 4 n.1.

## JURISDICTION AND VENUE

3.    For purposes of analyzing diversity jurisdiction, the citizenship of a limited liability company "depends on the citizenship of all the members composing the organization." *Rolling Greens MHP, L.P. v. Comcast SCH Holdings LLC*, 374 F.3d 1020, 1021 (11th Cir. 2004) (citing *Carden v. Arkoma Assocs.*, 494 U.S. 185, 195-96 (1990)).

4.    Where, as here, certain members of a limited liability company include a trust, citizenship is determined based on the state where the trustee lives and administers the trust. *Alliant Tax Credit 31, Inc. v. Murphy*, 924 F.3d

1134, 1141 (11th Cir. 2019) (citing *Americold Realty Trust v. Conagra Foods Inc*.,

136 S. Ct. 1012, 1016 (2016)).   As alleged in paragraph 1 above, the Trusts are

administered by citizens of Alabama and Georgia, making the Trusts citizens of

the same states.

5.      Complete diversity of citizenship exists between the parties because

Plaintiff is considered to be a citizen of the States of Florida, Alabama, and Georgia

while Kissaway is considered to be a citizen of the State of Virginia.[1]

6.      As further alleged below, the amount in controversy exceeds

---

[1]      Kissaway is registered as an active business with the Virginia Secretary of State.  Kissaway's registration and related information that is accessible online at the Virginia Secretary of State website does not identify the members of Kissaway or include Kissaway's operating agreement or other governing documents that would identify its members.  Despite exhaustive research of the information and records that are accessible to Plaintiff, as of the date this Complaint is filed, Plaintiff has not been able to confirm whether Kissaway has members other than Mr. Godwin.

However, to the extent the citizenship of the parties is in doubt, Plaintiff respectfully submits that the identity and citizenship of the members of Kissaway easily and quickly can be confirmed either (i) once Kissaway files it corporate disclosure statement pursuant to Fed. R. Civ. P. 7.1(a); or (ii) alternatively, by permitting Plaintiff to serve limited written discovery for jurisdictional purposes directed only at determining the citizenship of Kissaway's members.  *See Am. C.L. Union of Fla., Inc. v. City of Sarasota*, 859 F.3d 1337, 1341 (11th Cir. 2017); *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 729 n.7, 731 (11th Cir. 1982)).  *See also Nat'l Christmas Prods., Inc. v. Oj Commerce, LLC*, No. 22-CV-60897, 2024 WL 278132 * 3 (S.D. Fla. Jan. 25, 2024) (permitting limited discovery to verify citizenship of parties for establishing diversity jurisdiction).

Assuming jurisdictional discovery is necessary, and according to the Court's preference, Plaintiff will make its request in a formal motion.

$75,000.00, excluding interest and costs.

7.      Jurisdiction in this Court, therefore, is proper pursuant to 28 U.S.C.A. §1332.

8.      Additionally, the real property that is the subject of Plaintiff's claims is located in this district, and a substantial part, if not all, of the acts and/or omissions on which Plaintiff's claims are based occurred in this district.

9.      Venue in this Court, therefore, is proper pursuant to 28 U.S.C.A. §1391(b).

<u>**FACTUAL ALLEGATIONS**</u>

**I.    The Maintenance and Condition of the Premises during Plaintiff's Occupancy**

10.     In 2014, Plaintiff purchased approximately 1,190 acres of certain real property located in Jefferson County, Florida and known as the Kissaway Plantation (the "Premises").

11.     The Premises is a sprawling tract of land with a lake, duck pond, pastures and wooded trails, and includes certain attachments and amenities, including the main house, a separate staff residence, barn, a sixteen-(16) stall horse stables, dog kennels, and wooden-fenced horse pastures – all making it ideal for quail hunting.

12.     When Plaintiff purchased the Premises, it was being used and operated as a quail hunting plantation, and that also was Plaintiff's intended use and purpose in purchasing the Premises.

13.     Plaintiff owned and occupied the Premises as a quail hunting plantation from the time Plaintiff acquired it in 2014 until approximately early 2021 when plans were made to either sell or lease the Premises with an option to purchase.

14.     In the years leading up to 2021 and prior to leasing the Premises to Kissaway, Plaintiff invested considerable resources, both in time and money, to maintain the Premises.  Properly maintaining the Premises required Plaintiff to follow best land and habitat-management practices (for preserving and sustaining the land and quail) and to perform regular upkeep and maintenance or repair work, including, for example:

   (i)     Adequately burning and feeding the land (i.e., clearing and burning vegetation and plant buildup to expose food sources for quail and other habitat);

   (ii)    Regularly filling silos or feeders with grains to serve as a supplemental food source for the quail;

   (iii)   Ecosystem maintenance on the lake and duck pond, including routine testing and shocking of the water, adding appropriate animal or plant species, keeping trees or vegetation cut back, and draining and clearing the duck pond at least annually;

   (iv)    Regularly inspecting and making necessary repairs to the wooden fencing surrounding the horse pastures and barn area;

     (v)    Landscaping, including pruning and cutting back trees and vegetation around the lake, pond, main house, and barn, and replenishing and maintaining pine straw beds; and

     (vi)   Cleaning, painting, replacing/repairing wood rot, and similar upkeep in the barn and horse stalls.

15.    To ensure the above tasks were completed in a timely and satisfactory manner, Plaintiff employed a full-time property manager and additional employees who were responsible for performing and/or assisting with performing the above maintenance items and similar work that was necessary to keep the Premises well-maintained, consistent with Plaintiff's customary practice and objectives for the Premises.

16.    Throughout the period Plaintiff occupied the Premises and up until the Premises was tendered to and occupied by Kissaway (as discussed further below), Plaintiff ensured the Premises was kept in pristine condition.  In addition to protecting Plaintiff's financial investment, proper maintenance was important so that Plaintiff could enjoy the full use of the Premises and benefits of ownership.

17.    In addition to personal and social use (e.g., hosting family and friends), Plaintiff used the Premises for other purposes, including selling hunting days at rates ranging from $18,000 – $20,000 per day.  Many of the guests who reserved hunting days included banking and other professionals that Plaintiff considers business colleagues.

18.    Had the Premises not been maintained in the pristine condition that Plaintiff required, Plaintiff could not have sold hunting days at the rate that it did for many years, including through 2021 after Kissaway began leasing the Premises.

19.    In sum, allowing the Premises to become rundown and dilapidated was entirely unacceptable to Plaintiff for numerous reasons.  In addition to protecting its financial investment, including the ability to fetch top rates for the hunting days it sold each year, Plaintiff's principal, Mr. Weller, used the Premises to host his family members, friends, and/or business colleagues.  The notion that Mr. Weller would invite family, friends, and/or or business associates, much less guests who had paid significant sums, to visit the Premises in the state of unkempt disrepair in which Kissaway left the Premises is absurd.

## II.    Kissaway's Obligations under the Lease Agreement

20.    In the spring of 2021, Plaintiff began discussions with Kissaway concerning Kissaway's interest in potentially purchasing the Premises.

21.    Subsequently, Plaintiff and Kissaway entered a Lease Agreement dated May 28, 2021 ("the "Lease Agreement") pursuant to which Kissaway would lease and occupy the Premises for a three (3)-year term with the option to purchase the Premises.  As set forth in Section 5.02 of the Lease Agreement, the option could be exercised at any point prior to the expiration of the 3-year term.

22.    Contemporaneously with the Lease Agreement, the parties executed a separate Memorandum of Lease with Option to Purchase (the "Lease Memo").  The Lease Memo simply affirms the terms of the Lease Agreement and attaches and incorporates as exhibits to the Lease Agreement the tax map parcel and legal description of the Premises.

23.    In the preamble to the Lease Agreement, it defines Plaintiff as the "Landlord" and defines Kissaway as the "Tenant."   In the "Definitions" section of the Lease Agreement, "Premises" is defined as "the Land, any Improvements thereon and any and all rights, privileges, easements, and appurtenances to the Land and the Improvements and any development rights."  (Lease Agreement at p. 3).

24.    Otherwise, and as relevant to the claims asserted herein, the Lease Agreement provides, in pertinent part, as follows:[2]

### ARTICLE II
### LEASE OF PREMISES; CONDITION OF PREMISES; COMMENCEMENT DATE AGREEMENT; FAILURE TO DELIVER POSSESSION

**Section 2.02  Condition of Premises.**

…

Tenant accepts possession of the Premises in its "AS IS" condition on the Commencement Date.  Except as otherwise expressly provided in this Lease, ***Tenant has full responsibility for the repair, alteration, maintenance, and***

---

[2]    The provisions set forth below quote the terms in the Lease Agreement, provided, however, that the bold, italicized font has been added to emphasize the more relevant language.

*replacement of the Premises*; provided, however, that the foregoing shall not extend to any liability that may arise from Tenant discovering or reporting any condition that affected the Property prior to the Commencement Date (including, without limitation, the presence of Hazardous Materials or environmental contamination thereon). Tenant expressly acknowledges and agrees that Landlord has not made and is not making, and Tenant is not relying upon, any warranties or representations regarding the Premises, except to the extent same are expressly set forth in the Lease.

## ARTICLE VIII
## OPERATION OF THE PREMISES

**Section 8.01 Tenant's Operation of the Premises.** Tenant will operate the Premises as a quail hunting plantation, ***in a manner consistent with past practice and in a commercially reasonable manner for properties like the Premises***, and in all material respects in accordance with all Laws governing the Premises and this Lease.

…

**Section 8.04 Pinehaven Plantation.** Landlord hereby grants to Tenant during the Term a non-exclusive, non-transferable license to use the name and mark "Pinehaven Planation" in connection with the operation of the Premises during the term of the Lease.

## ARTICLE IX
## MAINTENANCE, REPAIRS, AND ALTERATIONS

**Section 9.01 Maintenance and Repair of the Premises.** Tenant shall, at all times during the Term of this Lease, at Tenant's sole cost and expense, ***keep and maintain the Premises,*** including the Improvements, appurtenances, and every part thereof that may exist on, in, or be made a part of the Premises, ***in the substantially the same condition as the Premises may be on the Commencement Date, ordinary wear and tear excepted, and make all necessary repairs thereto,*** interior and exterior, structural and non-structural; ordinary and extraordinary, and foreseen and unforeseen in order to maintain such condition. If Tenant fails to keep and maintain the Premises and the Improvements as required by this Lease, Landlord may (but shall not be required to) perform and satisfy same, and Tenant hereby agrees to reimburse Landlord upon demand, as Additional Rent, for the reasonable cost thereof to the extent not covered by insurance. Tenant shall not permit any material waste of the Premises.

## ARTICLE XIV
## DEFAULT; REMEDIES

**Section 14.02 Landlord's Remedies.** If this Lease is terminated pursuant to Section 14.01, or if Landlord reenters or obtains possession of the Premises by summary proceedings or any other legal action or proceeding or by any other legal act (without liability or obligation to Tenant or any other occupant of the Premises), all of the following provisions shall apply:

(a)     Tenant shall immediately vacate and ***surrender the Premises to Landlord in good order, condition, and repair,*** reasonable wear and tear and damage that Tenant is not obligated under the terms of this Lease to repair excepted.

## ARTICLE XV
## EXPIRATION OR TERMINATION

**Section 15.01 Extinguishment of Tenant's Rights.** Upon the termination or expiration of this Lease from any cause, all rights and interests of Tenant, and all persons whomsoever claiming by, through, or under Tenant (with the exception of the rights of Landlord arising under Section 14.02), shall immediately cease and terminate, and the Premises, all Improvements, and all Personalty located thereon, shall thence forward constitute and belong to and be the absolute property of Landlord or Landlord's successors and assigns, without further act or conveyance, and without liability to make such compensation to Tenant or to anyone whomsoever, and free and discharged from all and every lien, encumbrance, claim, and charge of any character created or attempted to be created by Tenant at any time. ***Tenant agrees, at the termination of this Lease, to surrender unto Landlord, all and singular the Premises*** with the then existing Improvements constructed and located thereon and therein, ***in the same condition as when the construction of Improvements was completed, only natural and normal wear and tear excepted***, unless Tenant shall be relieved of Tenant's obligation to repair, reconstruct, restore, or replace damaged or destroyed buildings, other structures, or improvements pursuant to Article XVI hereof.

## ARTICLE XXVIII
## MISCELLANEOUS

**Section 28.03 Attorneys' Fees.** If any action is brought by either

14

party against the other in connection with or arising out of this Lease, the prevailing party shall be entitled to recover from the other party its reasonable out-of-pocket costs and expenses, including, without limitation, reasonable attorneys' fees, incurred in connection with the prosecution or defense of such action.

(Lease Agreement, §§ 2, 7, 8, 14 15, and 28).

25.     Therefore, pursuant to the terms of the Lease Agreement, Kissaway agreed:

(i)     It accepted the Premises in its "As Is" condition as of the date the lease term commenced (Lease Agreement, § 2.02);

(ii)    Kissaway would be solely responsible for maintenance and any necessary repairs to the Premises during the lease term (Lease Agreement, §§ 2.02, 9.01)

(iii)   Kissaway would operate the Premises as a quail hunting plantation under the name "Pinehaven Plantation" and would do so in a manner consistent "with past practice and in a commercially reasonable manner" comparable to similar plantations (Lease Agreement, §§ 8.01, 8.04);

(iv)    Upon termination or expiration of the lease term, Kissaway would vacate and surrender the Premises in the same condition as it existed at the commencement of the lease, excluding normal wear and tear (Lease Agreement, §§ 14.02, 15.01);

(v)     If litigation is necessary due to Kissaway's breach of any of the above obligations and Plaintiff prevails, Kissaway shall pay Plaintiff's reasonable attorney's fees and expenses (Lease Agreement, § 28.03).

26.     In approximately April 2024, as the 3-year term of the Lease Agreement was close to expiring, Kissaway notified Plaintiff that it was waiving its option to purchase the Premises.

27.    On or about April 30, 2024, the parties executed the Termination of Option and Amendment to Lease Agreement ("Amended Lease Agreement").  The Amended Lease Agreement confirms the termination of Kissaway's option to purchase the premises and the parties' agreement that Kissaway would be permitted to continue occupying the Premises through May 31, 2024.  Specifically, the Amended Lease Agreement provides in pertinent part:

> During the month of May 2024, Tenant, including its employees and contractors, shall have unrestricted and unlimited access to the entire Premises through the Expiration Date. Additionally, Tenant's property, including horses, dogs, and other animals currently at the Premises may remain present until Tenant is able to make arrangements for their transfer or transport from the Premises; provided all are removed by May 31, 2024.

(Amended Lease Agreement, § 3(d)).

28.    In accordance with the above, Kissaway, including its property manager and horses, continued to occupy and use the Premises through May 31, 2024.

29.    When the amended term expired on May 31, 2024, the location where Kissaway was planning to relocate its horses was not yet ready, and at Kissaway's request, Plaintiff permitted Kissaway to continue occupying the Premises for several more months.

30.    It was not until approximately October 2024 that Kissaway fully vacated the Premises.

III.   **The Maintenance and Condition of the Premises during Kissaway's Occupancy.**

31.    Once Kissaway completely vacated and surrendered the Premises, the full extent of the damages resulting from Kissaway's lack of maintenance and Kissaway's total disregard of its obligations under the Lease Agreement was confirmed.  Indeed, numerous sections of wooden fencing surrounding the horse pastures and barn were broken or missing entirely.  The doors to the barn and interior horse stalls were broken and hanging from their hinges, and other sections of the barn were falling apart due to wood rot and other items that were not maintained or repaired in a timely fashion.  In addition, the stables were filthy, and Kissaway did not even clean up after its animals before vacating the Premises.  The landscaping throughout the Premises was extremely overgrown and unmaintained.  Trees and other vegetation had not been pruned, to the point they were growing into and covering the windows of the main house and invading the lake and duck pond, and pine straw beds were empty or had not been replenished in quite some time (if ever).  Additionally, no maintenance at all was done to the lake or duck pond, and neither had been properly stocked or drained and cleaned.

32.    In sum, Kissaway completely failed to satisfy any of its obligations to operate the Premises in a manner consistent with commercially reasonable and customary practices for quail hunting plantations.  Much less did Kissaway maintain

the Premises, or return the Premises, in the same excellent condition that Plaintiff maintained the Premises prior to leasing it to Kissaway.

## IV.    Plaintiff's Damages and Attempt to Reach an Amicable Resolution

33.    From approximately late October – December 2024, Plaintiff engaged several different contractors to inspect the unmaintained items and provide estimates for completing necessary repairs to the Premises.  While certain estimates have not been finalized or provided to Plaintiff, the total repair costs identified to date are approximately $154,334.88, itemized as follows:

(i)      Fence repairs = $71,480

(ii)     Barn repairs = $40,550

(iii)    Landscaping = $19,804.88; and

(iv)     Duck pond = $22,500

34.    The above estimates do not represent a complete list of all repair work that is needed or the full costs of performing the work.  For example, the duck pond estimate is only a partial estimate for clearing and burning the pond, which will require draining the pond and then removing and burning debris and vegetation.  The current estimate ($22,500) does not include the cost to drain the pond.  Until the pond is drained, the contractor cannot evaluate the full scope of work that will be

required to clear and burn the pond.  Thus, the above estimate is conservative and

will increase once the pond is drained, which will be a separate additional expense.[3]

35.     On December 11, 2024, Plaintiff notified Kissaway of the items and

areas of the Premises that plainly had not been maintained in breach of the Lease

Agreement.  Plaintiff also provided Kissaway with photographs of the barn, broken

fencing, and grossly overgrown and unmaintained landscaping along with copies of

repair estimates.

36.     In response, Kissaway denied that any of the items were the result of

its neglect or failure to comply with its lease obligations.  In fact, Kissaway claimed

that the issues Plaintiff was complaining about preexisted Kissaway's lease of the

Premises and then boldly accused Mr. Weller of trying to "fund raise for his property

renovations at [Kissaway's] expense."

37.     Despite additional efforts to reach an amicable resolution, which

continued through January 2025, Kissaway has denied any responsibility for the

damage and repair costs at issue – making it abundantly clear that Kissaway has no

---

[3]     From all that appears, Kissaway also did not feed, or at least adequately feed, the birds (quail), which if established, will cause Plaintiff to incur significant and long-lasting financial and related injuries.  While Plaintiff suspects Kissaway's neglect in feeding the birds is true and will be established, pending confirmation or additional evidence, Plaintiff has not included this item in the list of items that were not properly maintained during Kissaway's occupancy of the Premises or in Plaintiff's estimated cost of repairs.  To the extent appropriate, Plaintiff will amend its Complaint and claim for damages.

intention of honoring its promises or fulfilling its contractual obligations unless it this Court requires Kissaway to do so.

## COUNT I - Declaratory Judgment Pursuant to 28 U.S.C.A. § 2201

38.    Plaintiff adopts and incorporates paragraphs 1 – 37 of its Complaint as if set forth fully herein.

39.    There is a bona fide dispute between the parties concerning Kissaway's obligations under the Lease Agreement to maintain and make necessary repairs to the Premises and attachments or improvements thereto.

40.    Indeed, Plaintiff submits the Lease Agreement required Kissaway to maintain the items at issue and that Kissaway is responsible for paying the cost of necessary repairs.  Kissaway denies any obligation under the Lease Agreement to maintain the items currently in dispute and denies any responsibility for paying the cost of repair.

41.    Until certain repairs have been completed, albeit at considerable expense, the full scope of work that will be needed to remedy the items at issue and related cost cannot be determined.  Moreover, until the uncertainty concerning Kissaway's lease obligations is resolved, Plaintiff will be deprived the full use and enjoyment of the Premises and the rights and benefits it negotiated and bargained for under the Lease Agreement.

42.    Thus, there is a current need for certainty to resolve an actual

controversy, and a judgment declaring the parties' rights and obligations with respect to the instant dispute is both necessary and appropriate pursuant to 28 U.S.C.A. § 2201.

### Request for Relief

Based on the foregoing, and Plaintiff respectfully requests the Court enter a judgment declaring;

(i) The Lease Agreement required Kissaway to properly maintain and make timely repairs to the Premises to prevent the damage and maintenance issues currently existing on the Premises as outlined herein; and

(ii) Kissaway's failure to properly maintain the Premises during the period it occupied the Premises is a breach of its obligations under the Lease Agreement.

### COUNT II – Breach of Lease Agreement

43.    Plaintiff adopts and incorporates paragraphs 1 – 37 of its Complaint as if set forth fully herein.

44.    On or about May 28, 2021, the parties entered into a valid and binding Lease Agreement supported by adequate consideration and imposing material obligations on both parties.

45.    Under the Lease Agreement, Kissaway was obligated to operate the

Premises in a manner consistent "with past practice and in a commercially reasonable manner." Further, Kissaway was obligated to ensure the Premises and any attachments or improvements to the Premises were maintained and repaired so that upon termination of the Lease Agreement, the Premises would be returned to Plaintiff in good repair and in the same condition as at the commencement of the Lease Agreement.

46.    Kissaway has breached material terms of the Lease Agreement.

47.    As a result of Kissaway's failure and persistent refusal to honor its contractual obligations under the Lease Agreement, Plaintiff has suffered monetary damages, including the costs of making necessary repairs, loss of use and enjoyment of the Premises, and incurred reasonable attorney's fees and expenses.

## **Request for Relief**

Based on the foregoing, Plaintiff respectfully requests the Court enter a final judgment instructing:

(i)     Kissaway has materially breached terms of the Lease Agreement;

(ii)    Plaintiff is the prevailing party;

(iii)   Plaintiff shall be awarded compensatory damages, pre and post-judgment interest, and pursuant to Section 28.03 of the Lease Agreement, Plaintiff's reasonable attorney's fees and expenses; and

(iv)    Plaintiff shall be awarded any additional or other relief the Court deems just and proper.

Respectfully submitted on this 14th day of February 2025,


*/s/ Anne Laurie McClurkin*
ANNE LAURIE McCLURKIN
amcclurkin@maynardnexsen.com

**Attorney for Plaintiff Convent Properties, LLC**

**OF COUNSEL:**

MAYNARD NEXSEN PC
RSA Battle House Tower
11 North Water Street
Suite 24290
Mobile, Alabama 36602
Phone: 251-432-0001
Fax: 251-432-0007



**PLEASE SERVE DEFENDANT VIA CERTIFIED MAIL ADRESSED AS FOLLOWS:**

Kissaway, LLC
c/o Peake Law Group, PC
As its registered agent
1318 Clemons Way
Midlothian, VA 23114-000